PHILADELPHIA NEWSPAPERS, INC., ET AL. *v.*
HEPPS ET AL.

No. 84–1491.   Argued December 3, 1985—Decided April 21, 1986

O'CONNOR, J., delivered the opinion of the Court, in which BRENNAN,
MARSHALL, BLACKMUN, and POWELL, JJ., joined.   BRENNAN, J., filed
a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 779.   STE-

VENS, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE and REHNQUIST, JJ., joined, *post*, p. 780.

*David H. Marion* argued the cause for appellants. With him on the briefs were *Samuel E. Klein* and *Kerry L. Adams*.

*Ronald H. Surkin* argued the cause for appellees. With him on the brief was *Edwin P. Rome*.\*

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us once more to "struggl[e] . . . to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 325 (1974). In *Gertz*, the Court held that a private figure who brings a suit for defamation cannot recover without some showing that the media defendant was at fault in publishing the statements at issue. *Id.*, at 347. Here, we hold that, at least where a newspaper publishes speech of public

---

\*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *John G. Koeltl, James C. Goodale, Burt Neuborne, Jack D. Novick, Stefan Presser, Bruce W. Sanford, W. Terry Maguire, R. Bruce Rich, Robert D. Sack*, and *Alice Neff Lucan;* for the American Federation of Labor and Congress of Industrial Organizations by *David M. Silberman* and *Laurence Gold;* for Capital Cities Communications, Inc., et al. by *Bernard G. Segal, Jerome J. Shestack, Carl A. Solano, Elihu A. Greenhouse,* and *Lawrence Gunnels;* and for Print and Broadcast Media et al. by *E. Barrett Prettyman, Jr., Dan Paul, Franklin G. Burt, Steven M. Kamp, John H. McElhaney, Richard M. Schmidt, Jr., Peter G. Banta, Stuart F. Pierson, Neil L. Shapiro, Wilford W. Kirton, Jr., David M. Olive, Theodore Sherbow, Robert Haydock, Jr., Peter Michael Meloy, W. Joel Blass, William W. Ogden, Eric D. Lanphere, Michael A. Gross, Conrad M. Shumadine, William A. Niese, Norton L. Armour, H. Hugh Stevens, Jr., Thomas T. Cobb, Michael Minnis, James L. Koley, J. Laurent Scharff, Alexander Wellford, Donald B. Holbrook, Edward P. Davis, Jr., P. Cameron DeVore, Gregg D. Thomas, Jack M. Weiss, Rutledge C. Clement, Jr.,* and *George K. Rahdert.*

*Daniel J. Popeo* filed a brief for the American Legal Foundation as *amicus curiae* urging affirmance.

concern, a private-figure plaintiff cannot recover damages without also showing that the statements at issue are false.

## I

Maurice S. Hepps is the principal stockholder of General Programming, Inc. (GPI), a corporation that franchises a chain of stores—known at the relevant time as "Thrifty" stores—selling beer, soft drinks, and snacks. Mr. Hepps, GPI, and a number of its franchisees are the appellees here.[1] Appellant Philadelphia Newspapers, Inc., owns the Philadelphia Inquirer (Inquirer). The Inquirer published a series of articles, authored by appellants William Ecenbarger and William Lambert, containing the statements at issue here. The general theme of the five articles, which appeared in the Inquirer between May 1975 and May 1976, was that appellees had links to organized crime and used some of those links to influence the State's governmental processes, both legislative and administrative. The articles discussed a state legislator, described as "a Pittsburgh Democrat and convicted felon," App. A60, whose actions displayed "a clear pattern of interference in state government by [the legislator] on behalf of Hepps and Thrifty," *id.*, at A62–A63. The stories reported that federal "investigators have found connections between Thrifty and underworld figures," *id.*, at A65; that "the Thrifty Beverage beer chain . . . had connections . . . with organized crime," *id.*, at A80; and that Thrifty had "won a series of competitive advantages through rulings by the State Liquor Control Board," *id.*, at A65. A grand jury was said to be investigating the "alleged relationship between the Thrifty chain and known Mafia figures," and "[w]hether the chain received special treatment from the [state Governor's] administration and the Liquor Control Board." *Id.*, at A68.

---

[1] Appellants list nine entities as appellees in the proceedings in this Court: Maurice S. Hepps; General Programming, Inc.; A. David Fried, Inc.; Brookhaven Beverage Distributors, Inc.; Busy Bee Beverage Co.; ALMIK, Inc.; Lackawanna Beverage Distributors; N. F. O., Inc.; and Elemar, Inc. Brief for Appellants ii.

Appellees brought suit for defamation against appellants in a Pennsylvania state court. Consistent with *Gertz, supra*, Pennsylvania requires a private figure who brings a suit for defamation to bear the burden of proving negligence or malice by the defendant in publishing the statements at issue. 42 Pa. Cons. Stat. § 8344 (1982). As to falsity, Pennsylvania follows the common law's presumption that an individual's reputation is a good one. Statements defaming that person are therefore presumptively false, although a publisher who bears the burden of proving the truth of the statements has an absolute defense. See 506 Pa. 304, 313–314, 485 A. 2d 374, 379 (1984). See also 42 Pa. Cons. Stat. § 8343(b)(1) (1982) (defendant has the burden of proving the truth of a defamatory statement). Cf. *Gertz, supra*, at 349 (common law presumes injury to reputation from publication of defamatory statements). See generally Eaton, The American Law of Defamation Through *Gertz* v. *Robert Welch, Inc.*, and Beyond: An Analytical Primer, 61 Va. L. Rev. 1349, 1352–1357 (1975) (describing common-law scheme of defamation law).

The parties first raised the issue of burden of proof as to falsity before trial, but the trial court reserved its ruling on the matter. Appellee Hepps testified at length that the statements at issue were false, Tr. 2221–2290, and he extensively cross-examined the author of the stories as to the veracity of the statements at issue. After all the evidence had been presented by both sides, the trial court concluded that Pennsylvania's statute giving the defendant the burden of proving the truth of the statements violated the Federal Constitution. *Id.*, at 3589. The trial court therefore instructed the jury that the plaintiffs bore the burden of proving falsity. *Id.*, at 3848.

During the trial, appellants took advantage of Pennsylvania's "shield law" on a number of occasions. That law allows employees of the media to refuse to divulge their sources. See 42 Pa. Cons. Stat. § 5942(a) (1982) ("No person . . . employed by any newspaper of general circulation . . . or any

radio or television station, or any magazine of general circulation, . . . shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit"). See also 506 Pa., at 327, 485 A. 2d, at 387 ("This statute has been interpreted broadly"). Appellees requested an instruction stating that the jury could draw a negative inference from appellants' assertions of the shield law; appellants requested an instruction that the jury could not draw any inferences from those exercises of the shield law's privilege. The trial judge declined to give either instruction. Tr. 3806–3808. The jury ruled for appellants and therefore awarded no damages to appellees.

Pursuant to Pennsylvania statute, 42 Pa. Cons. Stat. § 722(7) (1982), the appellees here brought an appeal directly to the Pennsylvania Supreme Court. That court viewed *Gertz* as simply requiring the plaintiff to show fault in actions for defamation. It concluded that a showing of fault did not require a showing of falsity, held that to place the burden of showing truth on the defendant did not unconstitutionally inhibit free debate, and remanded the case for a new trial.[2] 506 Pa., at 318–329, 485 A. 2d, at 382–387. We noted probable jurisdiction, 472 U. S. 1025 (1985), and now reverse.

II

In *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), the Court "determin[ed] for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a

_____

[2] The state courts that have considered this issue since *Gertz* have reached differing conclusions. Compare, *e. g., Denny* v. *Mertz*, 106 Wis. 2d 636, 654–658, 318 N. W. 2d 141, 150–151 (defendant must bear burden of showing truth), cert. denied, 459 U. S. 883 (1982), and *Memphis Publishing Co.* v. *Nichols*, 569 S. W. 2d 412 (Tenn. 1978) (same), with *Gazette, Inc.* v. *Harris*, 229 Va. 1, 15–16, 325 S. E. 2d 713, 725 (plaintiff must bear burden of showing falsity), cert. denied, 473 U. S. 905 (1985), and *Madison* v. *Yunker*, 180 Mont. 54, 67, 589 P. 2d 126, 133 (1978) (same).

public official against critics of his official conduct." *Id.*, at 256. The State's trial court in that case believed the statements tended to injure the plaintiff's reputation or bring him into public contempt, *id.*, at 267, and were therefore libelous *per se*, *id.*, at 262. The trial court therefore instructed the jury that it could presume falsity, malice, and some damage to reputation, as long as it found that the defendant had published the statements and that the statements concerned the plaintiff. *Ibid.* The trial court also instructed the jury that an award of punitive damages required "malice" or "actual malice." *Id.*, at 262, 267. The jury found for the plaintiff and made an award of damages that did not distinguish between compensatory and punitive damages. *Id.*, at 262. The Alabama Supreme Court upheld the judgment of the trial court in all respects. *Id.*, at 263.

This Court reversed, holding that "libel can claim no talismanic immunity from constitutional limitations." *Id.*, at 269. Against the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks," the Court noted that "[a]uthoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth — whether administered by judges, juries, or administrative officials — and especially one that puts the burden of proving truth on the speaker." *Id.*, at 270–271. Freedoms of expression require "'breathing space,'" *id.*, at 272 (quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963)):

> "A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions — and to do so on pain of libel judgments virtually unlimited in amount — leads to . . . 'self-censorship.' . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt

whether it can be proved in court or fear of the expense of having to do so." 376 U. S., at 279.

The Court therefore held that the Constitution

"prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280.

That showing must be made with "convincing clarity," *id.*, at 285–286, or, in a later formulation, by "clear and convincing proof," *Gertz*, 418 U. S., at 342. The standards of *New York Times* apply not only when a public official sues a newspaper, but also when a "public figure" sues a magazine or news service. See *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 162–165 (1967) (Warren, C. J., concurring in result); *id.*, at 170 (opinion of Black, J.); *id.*, at 172 (opinion of BRENNAN, J.). See also *Wolston* v. *Reader's Digest Assn., Inc.*, 443 U. S. 157, 163–169 (1979).

A decade after *New York Times*, the Court examined the constitutional limits on defamation suits by private-figure plaintiffs against media defendants. *Gertz, supra.* The Court concluded that the danger of self-censorship was a valid, but not the exclusive, concern in suits for defamation: "The need to avoid self-censorship by the news media is . . . , not the only societal value at issue . . . [or] this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz, supra*, at 341. See also *Rosenblatt* v. *Baer*, 383 U. S. 75, 92 (1966) (Stewart, J., concurring). Any analysis must also take into account the "legitimate state interest underlying the law of libel [in] the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz, supra*, at 341. See also *Time, Inc.* v. *Firestone*, 424 U. S. 448, 456 (1976) (dis-

cussing the "appropriate accommodation between the public's interest in an uninhibited press and its equally compelling need for judicial redress of libelous utterances"). In light of that interest, and in light of the fact that private figures have lesser access to media channels useful for counteracting false statements and have not voluntarily placed themselves in the public eye, *Gertz, supra,* at 344–345, the Court held that the Constitution "allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times,*" 418 U. S., at 348: "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.,* at 347. Nonetheless, even when private figures are involved, the constitutional requirement of fault supersedes the common law's presumptions as to fault and damages. In addition, the Court in *Gertz* expressly held that, although a showing of simple fault sufficed to allow recovery for actual damages, even a private-figure plaintiff was required to show actual malice in order to recover presumed or punitive damages. *Id.,* at 348–350.

The Court most recently considered the constitutional limits on suits for defamation in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.,* 472 U. S. 749 (1985). In sharp contrast to *New York Times, Dun & Bradstreet* involved not only a private-figure plaintiff, but also speech of purely private concern. 472 U. S., at 751–752. A plurality of the Court in *Dun & Bradstreet* was convinced that, in a case with such a configuration of speech and plaintiff, the showing of actual malice needed to recover punitive damages under either *New York Times* or *Gertz* was unnecessary:

> "In light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest [in preserving private reputation] adequately supports awards of presumed and punitive

damages—even absent a showing of 'actual malice.'"
472 U. S., at 761 (opinion of POWELL, J.) (footnote
omitted).

See also *id.*, at 764 (BURGER, C. J., concurring in judgment);
*id.*, at 774 (WHITE, J., concurring in judgment).

One can discern in these decisions two forces that may
reshape the common-law landscape to conform to the First
Amendment. The first is whether the plaintiff is a public of-
ficial or figure, or is instead a private figure. The second is
whether the speech at issue is of public concern. When the
speech is of public concern and the plaintiff is a public official
or public figure, the Constitution clearly requires the plaintiff
to surmount a much higher barrier before recovering dam-
ages from a media defendant than is raised by the common
law. When the speech is of public concern but the plaintiff is
a private figure, as in *Gertz*, the Constitution still supplants
the standards of the common law, but the constitutional re-
quirements are, in at least some of their range, less forbid-
ding than when the plaintiff is a public figure and the speech
is of public concern. When the speech is of exclusively pri-
vate concern and the plaintiff is a private figure, as in *Dun &
Bradstreet*, the constitutional requirements do not necessar-
ily force any change in at least some of the features of the
common-law landscape.

Our opinions to date have chiefly treated the necessary
showings of fault rather than of falsity. Nonetheless, as one
might expect given the language of the Court in *New York
Times*, see *supra*, at 772–773, a public-figure plaintiff must
show the falsity of the statements at issue in order to prevail
in a suit for defamation. See *Garrison* v. *Louisiana*, 379
U. S. 64, 74 (1964) (reading *New York Times* for the proposi-
tion that "a public official [is] allowed the civil [defamation]
remedy only if he establishes that the utterance was false").
See also *Herbert* v. *Lando*, 441 U. S. 153, 176 (1979) ("[T]he
plaintiff must focus on the editorial process and prove a false
publication attended by some degree of culpability").

Here, as in *Gertz*, the plaintiff is a private figure and the newspaper articles are of public concern. In *Gertz*, as in *New York Times*, the common-law rule was superseded by a constitutional rule. We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.

There will always be instances when the factfinding process will be unable to resolve conclusively whether the speech is true or false; it is in those cases that the burden of proof is dispositive. Under a rule forcing the plaintiff to bear the burden of showing falsity, there will be some cases in which plaintiffs cannot meet their burden despite the fact that the speech is in fact false. The plaintiff's suit will fail despite the fact that, in some abstract sense, the suit is meritorious. Similarly, under an alternative rule placing the burden of showing truth on defendants, there would be some cases in which defendants could not bear their burden despite the fact that the speech is in fact true. Those suits would succeed despite the fact that, in some abstract sense, those suits are unmeritorious. Under either rule, then, the outcome of the suit will sometimes be at variance with the outcome that we would desire if all speech were either demonstrably true or demonstrably false.

This dilemma stems from the fact that the allocation of the burden of proof will determine liability for some speech that is true and some that is false, but *all* of such speech is *unknowably* true or false. Because the burden of proof is the deciding factor only when the evidence is ambiguous, we cannot know how much of the speech affected by the allocation of the burden of proof is true and how much is false. In a case presenting a configuration of speech and plaintiff like the one we face here, and where the scales are in such an uncertain balance, we believe that the Constitution requires us to tip them in favor of protecting true speech. To ensure that true speech on matters of public concern is not deterred,

we hold that the common-law presumption that defamatory speech is false cannot stand when a plaintiff seeks damages against a media defendant for speech of public concern.

In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified. See *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 540 (1980) (content-based restriction); *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978) (speaker-based restriction); *Renton* v. *Playtime Theatres, Inc., ante*, at 47–54 (secondary-effects restriction). See also *Speiser* v. *Randall*, 357 U. S. 513 (1958) (striking down the precondition that a taxpayer sign a loyalty oath before receiving certain tax benefits). It is not immediately apparent from the text of the First Amendment, which by its terms applies only to governmental action, that a similar result should obtain here: a suit by a private party is obviously quite different from the government's direct enforcement of its own laws. Nonetheless, the need to encourage debate on public issues that concerned the Court in the governmental-restriction cases is of concern in a similar manner in this case involving a private suit for damages: placement by state law of the burden of proving truth upon media defendants who publish speech of public concern deters such speech because of the fear that liability will unjustifiably result. See *New York Times*, 376 U. S., at 279; *Garrison, supra*, at 74 ("Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned"). Because such a "chilling" effect would be antithetical to the First Amendment's protection of true speech on matters of public concern, we believe that a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant. To do otherwise could "only result in a deterrence of speech which the Constitution makes free." *Speiser, supra*, at 526.

We recognize that requiring the plaintiff to show falsity will insulate from liability some speech that is false, but unprovably so. Nonetheless, the Court's previous decisions on the restrictions that the First Amendment places upon the common law of defamation firmly support our conclusion here with respect to the allocation of the burden of proof. In attempting to resolve related issues in the defamation context, the Court has affirmed that "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz*, 418 U. S., at 341. Here the speech concerns the legitimacy of the political process, and therefore clearly "matters." See *Dun & Bradstreet*, 472 U. S., at 758–759 (speech of public concern is at the core of the First Amendment's protections). To provide " 'breathing space,' " *New York Times*, *supra*, at 272 (quoting *NAACP* v. *Button*, 371 U. S., at 433), for true speech on matters of public concern, the Court has been willing to insulate even *demonstrably* false speech from liability, and has imposed additional requirements of fault upon the plaintiff in a suit for defamation. See, *e. g.*, *Garrison*, 379 U. S., at 75; *Gertz*, *supra*, at 347. We therefore do not break new ground here in insulating speech that is not even demonstrably false.

We note that our decision adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation. The plaintiff must show fault. A jury is obviously more likely to accept a plaintiff's contention that the defendant was at fault in publishing the statements at issue if convinced that the relevant statements were false. As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted. See Keeton, Defamation and Freedom of the Press, 54 Texas L. Rev. 1221, 1236 (1976). See also Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 856–857 (1984).

We recognize that the plaintiff's burden in this case is weightier because of Pennsylvania's "shield" law, which allows employees of the media to refuse to divulge their sources. See *supra*, at 770–771.[3] But we do not have before us the question of the permissible reach of such laws. Indeed, we do not even know the precise reach of Pennsylvania's statute. The trial judge refused to give any instructions to the jury as to whether it could, or should, draw an inference adverse to the defendant from the defendant's decision to use the shield law rather than to present affirmative evidence of the truthfulness of some of the sources. See *supra*, at 771. That decision of the trial judge was not addressed by Pennsylvania's highest court, nor was it appealed to this Court.[4] In the situation before us, we are unconvinced that the State's shield law requires a different constitutional standard than would prevail in the absence of such a law.

For the reasons stated above, the judgment of the Pennsylvania Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE BLACKMUN joins, concurring.

I believe that where allegedly defamatory speech is of public concern, the First Amendment requires that the plaintiff,

---

[3] Pennsylvania is not alone in this choice. See, *e. g.*, Ala. Code § 12–21–142 (1977); Cal. Const., Art. I, § 2(b); N. Y. Civ. Rights Law § 79–h (McKinney 1976).

[4] We also have no occasion to consider the quantity of proof of falsity that a private-figure plaintiff must present to recover damages. Nor need we consider what standards would apply if the plaintiff sues a nonmedia defendant, see *Hutchinson* v. *Proxmire*, 443 U. S. 111, 133, n. 16 (1979), or if a State were to provide a plaintiff with the opportunity to obtain a judgment that declared the speech at issue to be false but did not give rise to liability for damages.

whether public official, public figure, or private individual, prove the statements at issue to be false, and thus join the Court's opinion. Cf. *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971). I write separately only to note that, while the Court reserves the question whether the rule it announces applies to nonmedia defendants, *ante*, at 779, n. 4, I adhere to my view that such a distinction is "irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual.'" *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 781 (1985) (BRENNAN, J., dissenting) (quoting *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 777 (1978)).

JUSTICE STEVENS, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE REHNQUIST join, dissenting.

The issue the Court resolves today will make a difference in only one category of cases—those in which a private individual can prove that he was libeled by a defendant who was at least negligent. For unless such a plaintiff can overcome the burden imposed by *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 347 (1974), he cannot recover regardless of how the burden of proof on the issue of truth or falsity is allocated. By definition, therefore, the only litigants—and the only publishers—who will benefit from today's decision are those who act negligently or maliciously.

The Court, after acknowledging the need to "'accommodat[e] . . . the law of defamation and the freedoms of speech and press protected by the First Amendment,'" *ante*, at 768 (quoting *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 325), decides to override "the common-law presumption" retained by several States[1] that "defamatory speech is false" because of

---

[1] See, *e. g.*, *Elliott* v. *Roach*, 409 N. E. 2d 661, 681 (Ind. App. 1980); *Trahan* v. *Ritterman*, 368 So. 2d 181, 184 (La. App. 1979); *Parsons* v. *Gulf*

the need "[t]o ensure that true speech on matters of public concern is not deterred." *Ante,* at 776–777. I do not agree that our precedents require a private individual to bear the risk that a defamatory statement—uttered either with a mind toward assassinating his good name or with careless indifference to that possibility—cannot be proven false. By attaching no weight to the State's interest in protecting the private individual's good name, the Court has reached a pernicious result.

The state interest in preventing and redressing injuries to reputation is obviously important. As Justice Stewart eloquently reminded us in his concurrence in *Rosenblatt* v. *Baer,* 383 U. S. 75, 92–94 (1966):

> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.
>
> .        .        .        .        .
>
> ". . . The First and Fourteenth Amendments have not stripped private citizens of all means of redress for inju-

---

& *South American S.S. Co.,* 194 So. 2d 456, 460 (La. App.), cert. denied, 389 U. S. 896 (1967); *Madison* v. *Yunker,* 180 Mont. 54, 61, 589 P. 2d 126, 129–130 (1978); *Rogozinski* v. *Airstream by Angell,* 152 N. J. Super. 133, 146–147, 377 A. 2d 807, 814 (1977), modified, 164 N. J. Super. 465, 397 A. 2d 334 (1979); *Martin* v. *Griffin Television, Inc.,* 549 P. 2d 85, 87, 94 (Okla. 1976); *Corabi* v. *Curtis Publishing Co.,* 441 Pa. 432, 447–451, 468, 273 A. 2d 899, 907–909, 917 (1971); *Memphis Publishing Co.* v. *Nichols,* 569 S. W. 2d 412, 420 (Tenn. 1978); *Frank B. Hall & Co., Inc.* v. *Buck,* 678 S. W. 2d 612, 623–625 (Tex. App. 1984), cert. denied, 472 U. S. 1009 (1985); *Denny* v. *Mertz,* 106 Wis. 2d 636, 654–655, 318 N. W. 2d 141, 150, cert. denied, 459 U. S. 883 (1982).

ries inflicted upon them by careless liars. The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

"Moreover, the preventive effect of liability for defamation serves an important public purpose. For the rights and values of private personality far transcend mere personal interests. Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society."[2]

While deliberate or inadvertent libels vilify private personages, they contribute little to the marketplace of ideas. In assaying the First Amendment side of the balance, it helps to remember that the perpetrator of the libel suffers from its failure to demonstrate the truth of its accusation only if the "private-figure" plaintiff first establishes that the publisher is at "fault," 418 U. S., at 347—*i. e.*, either that it published its libel with "actual malice" in the *New York Times* sense ("with knowledge that it was false or with reckless disregard of whether it was false or not," *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964)), or that it published with that degree of careless indifference characteristic of negligence. Far from being totally in the dark about "how much

---

[2] "There is no doubt about the historical fact that the interest in one's good name was considered an important interest requiring legal protection more than a thousand years ago; and that so far as Anglo-Saxon history is concerned this interest became a legally protected interest comparatively soon after the interest in bodily integrity was given legal protection." L. Eldridge, The Law of Defamation § 53, pp. 293–294 (1978).

See *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 757–758 (1985) (opinion of POWELL, J.); *id.*, at 767–769 (WHITE, J., concurring in judgment); *id.*, at 793, n. 16 (BRENNAN, J., dissenting) ("[T]he individual's interest in reputation is certainly at the core of notions of human dignity"); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 341 (1974).

of the speech affected by the allocation of the burden of proof is true and how much is false," *ante,* at 776, the antecedent fault determination makes irresistible the inference that a significant portion of this speech is beyond the constitutional pale.[3] This observation is almost tautologically true with regard to libels published with "actual malice." For that standard to be met, the publisher must come close to willfully blinding itself to the falsity of its utterance.[4] The observation is also valid, albeit to a lesser extent, with respect to

---

[3] "But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co.* v. *Sullivan,* 376 U. S. [254,] 270 [(1964)]. They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942)." *Gertz* v. *Robert Welch, Inc.,* 418 U. S., at 340.
But cf. *New York Times Co.* v. *Sullivan,* 376 U. S., at 279, n. 19.

[4] "Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison* v. *State of Louisiana,* 379 U. S. 64 (1964), . . . the opinion emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.' 379 U. S., at 74. Mr. Justice Harlan's opinion in *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity' was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstates actual malice." *St. Amant* v. *Thompson,* 390 U. S. 727, 731 (1968).
See *Rosenblatt* v. *Baer,* 383 U. S. 75, 92 (1966) (Stewart, J., concurring) ("What the *New York Times* rule ultimately protects is defamatory falsehood").

defamations uttered with "fault."[5]   Thus, while the public's interest in an uninhibited press is at its nadir when the publisher is at fault or worse, society's "equally compelling" need

---

[5] It is presumably for this reason that the Court believes that its "decision adds only marginally to the burdens that the plaintiff must already bear as a result of our earlier decisions in the law of defamation." *Ante*, at 778. See *ibid.* ("As a practical matter, then, evidence offered by plaintiffs on the publisher's fault in adequately investigating the truth of the published statements will generally encompass evidence of the falsity of the matters asserted" (citations omitted)).

Although I am inclined to agree with the preceding observation, I do not agree that it supports the result reached by the Court today.   That allocation of the burden of proof is inconsequential in many cases provides no answer to cases in which it is determinative.   See *infra*, at 785–787. Moreover, the Court's belief, however sincere, that its decision will not significantly impair the state interest in redressing injury to reputation is not itself sufficient to justify overriding state law.   See *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 349.

I note that the Court makes no claim that its decision to impose on private-figure libel plaintiffs the burden of proving falsity is necessary to prevent jury confusion.   See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 116, pp. 839–840 (5th ed. 1984) ("[T]here is no inconsistency in assuming falsity until defendant publisher proves otherwise and requiring the plaintiff to prove negligence or recklessness with respect to the truth or falsity of the imputation").   See also 506 Pa. 304, 325, n. 13, 485 A. 2d 374, 385, n. 13 (1984) ("In a rather circuitous argument, [appellants] contend that falsity is inextricably bound up with proof of fault.   [Appellants] assert that to prove fault the plaintiff in fact must demonstrate the falsity of the matter.   While in some instances the plaintiff may elect to establish the patent error in the material to demonstrate the lack of due care in ascertaining its truth, it does not necessarily follow that negligence of the defendant can only be shown by proving that the material is false.   A plaintiff can demonstrate negligence in the manner in which the material was gathered, regardless of its truth or falsity.   In such instance the presumption of falsity will prevail unless the defendant elects to establish the truth of the material and thereby insulate itself from liability.   Where it is necessary to prove falsity to establish the negligence of the defendant, it is then the burden of the plaintiff to do so. . . . That proposition will not, of course, hold true in all cases.   Where negligence can be established without a demonstration of the falsity of the material, there is no additional obligation upon the plaintiff to prove the falsity of the material").

for judicial redress of libelous utterances is at its zenith. *Time, Inc.* v. *Firestone*, 424 U. S. 448, 456 (1976).

To appreciate the thrust of the Court's holding, we must assume that a private-figure libel plaintiff can prove that a story about him was published with "actual malice"—that is, without the publisher caring in the slightest whether it was false or not. Indeed, in order to comprehend the full ramifications of today's decision, we should assume that the publisher knew that it would be impossible for a court to verify or discredit the story and that it was published for no other purpose than to destroy the reputation of the plaintiff. Even if the plaintiff has overwhelming proof of malice—in both the common-law sense and as the term was used in *New York Times Co.* v. *Sullivan*—the Court today seems to believe that the character assassin has a constitutional license to defame.[6]

In my opinion deliberate, malicious character assassination is not protected by the First Amendment to the United States Constitution. That Amendment does require the target of a defamatory statement to prove that his assailant was at fault, and I agree that it provides a constitutional shield for truthful statements. I simply do not understand, however, why a character assassin should be given an absolute license to defame by means of statements that can be neither verified nor disproved. The danger of deliberate defamation by reference to unprovable facts is not a merely speculative or hypothetical concern. Lack of knowledge about third parties, the loss of critical records, an uncertain recollection about events that occurred long ago, perhaps during a period of special stress, the absence of eyewitnesses—a host of fac-

---

[6] This license would gain immeasurable strength if courts take up the suggestion of commentators in the Court's camp that the nonfalsifiable nature of a libel should entitle the defendant to summary judgment. See Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 865 (1984) ("If the plaintiff's suit is based upon a statement that is not susceptible to being proved false, for example, the court should deny any discovery and dismiss the complaint").

tors—may make it impossible for an honorable person to disprove malicious gossip about his past conduct, his relatives, his friends, or his business associates.

The danger of which I speak can be illustrated within the confines of this very case. Appellants published a series of five articles proclaiming that "Federal authorities . . . have found connections between Thrifty and underworld figures," App. A65; that "Federal agents have evidence of direct financial involvement in Thrifty by [Joseph] Scalleat," a "leader of organized crime in northeastern Pennsylvania," *id.*, at A72; and that "the Thrifty Beverage beer chain . . . had connections itself with organized crime," *id.*, at A80.[7] The defamatory character of these statements is undisputed. Yet the factual basis for the one specific allegation contained in them is based on an admitted relationship between appellees and a third party. The truth or falsity of that statement depends on the character and conduct of that third party—a matter which the jury may well have resolved against the plaintiffs on the ground that they could not disprove the allegation on which they bore the burden of proof.[8]

Despite the obvious blueprint for character assassination provided by the decision today, the Court's analytical approach—by attaching little or no weight to the strong state interest in redressing injury to private reputation—provides a wholly unwarranted protection for malicious gossip. As I understand the Court's opinion, its counterintuitive result is derived from a straightforward syllogism. The major premise seems to be that "the First Amendment's protection of true speech on matters of public concern," *ante*, at 777, is

---

[7] The parties agree that "the thrust of the challenged publications was that the Thrifty chain was connected with underworld figures and organized crime. It was that proposition that was required to be proven false." Brief for Appellants 36.

[8] At trial, the individual plaintiff simply denied knowledge of Joseph Scalleat's employment with Beer Sales Consultants and of BSC's employment by three Thrifty stores. See Testimony of Maurice Hepps, Tr. 2185–2186, 2200.

tantamount to a command that no rule of law can stand if it will exclude any true speech from the public domain. The minor premise is that although "we cannot know how much of the speech affected by the allocation of the burden of proof is true and how much is false," *ante*, at 776, at least some unverifiable gossip is true. From these premises it necessarily follows that a rule burdening the dissemination of such speech would contravene the First Amendment. Accordingly, "a private-figure plaintiff must bear the burden of showing that the speech at issue is false before recovering damages for defamation from a media defendant." *Ante*, at 777.

The Court's result is plausible however, only because it grossly undervalues the strong state interest in redressing injuries to private reputations. The error lies in its initial premise, with its mistaken belief that doubt regarding the veracity of a defamatory statement must invariably be resolved in favor of constitutional protection of the statement and against vindication of the reputation of the private individual. To support its premise, the Court relies exclusively on our precedents requiring the government to bear the burden of proving that a restriction of speech is justified. See *ante*, at 777–778. Whether such restrictions appear in the form of legislation burdening the speech of particular speakers or of particular points of view, or of common-law actions punishing seditious libel, the Court is doubtlessly correct that the government or its agents must at a minimum shoulder the burden of proving that the speech is false and must do so with sufficient reliability that we can be confident that true speech is not suppressed. It was to achieve this reliability that the Court, in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), incorporated into the First Amendment the then-emergent common-law "privilege for [good-faith] criticism of official conduct." *Id.*, at 282. See *id.*, at 282, n. 21. Because "erroneous statement is inevitable in free debate, and [because] it must be protected if the freedoms of expres-

sion are to have the 'breathing space' that they 'need . . . to survive, *N.A.A.C.P.* v. *Button,* 371 U. S. 415, 433 [1963],'" *id.,* at 271–272, this privilege is defeasible only if the defamatory statement "was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not," *id.,* at 279–280. "Allowance of the defense of truth, with the burden of proving it on the defendant," was found wanting because it did not "mean that only false speech [would] be deterred"—doubts regarding whether truth "can be proved in court or fear of the expense of having to do so" would force good-faith critics of official conduct to "'steer far wider of the unlawful zone,'" *id.,* at 279 (quoting *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958)).[9]

Even assuming that attacks on the reputation of a public figure should be presumed to be true, however, a different calculus is appropriate when a defamatory statement disparages the reputation of a private individual.[10] In that case, the overriding concern for reliable protection of truthful statements must make room for "[t]he legitimate state interest underlying the law of libel"—"the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz* v. *Robert Welch, Inc.,* 418 U. S., at 341. A public official, of course, has no "less interest in protecting his reputation than an individual in private life." *Rosenbloom* v. *Metromedia,* 403 U. S. 29, 46 (1971) (opinion of

---

[9] The *New York Times Co.* v. *Sullivan* privilege was subsequently extended to "public figures." See *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 164 (1967) (Warren, C. J., concurring in result).

[10] If the issue were properly before us, I would be inclined to the view that public figures should not bear the burden of disproving the veracity of accusations made against them with "actual malice," as the *New York Times* Court used that term. The contrary remarks in cases such as *Garrison* v. *Louisiana,* 379 U. S. 64, 74 (1964), were not necessary to the decisions in those cases, and they do not persuade me that the constitutional value in truthful statements requires any more protection of defamatory utterances whose truth may not be ascertained than is provided by the *New York Times* test.

BRENNAN, J.). But private persons are "more vulnerable to injury" and "more deserving of recovery"—more vulnerable because they lack "access to the channels of effective communication . . . to counteract false statements"; more deserving because they have "relinquished no part of [their] good name[s]" by "thrust[ing] themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 344–345.

Recognition of the "strong and legitimate [state] interest in compensating private individuals for injury to reputation," *id.*, at 348–349, exposes the untenability of the Court's methodology: the burden of proof in "private-figure" libel suits simply cannot be determined by reference to our precedents having the reputations of "public figures" in mind. In libel cases brought by the latter category of plaintiffs,

> "we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement . . . but the possibility of such error . . . would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate." *Rosenbloom* v. *Metromedia*, 403 U. S., at 50 (opinion of BRENNAN, J.).

In libel suits brought by private individuals, in contrast, "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain." *Gertz* v. *Robert Welch, Inc.*, 418 U. S., at 343. To be sure, both categories of cases involve "speech that matters." *Id.*, at 341. But "[t]he extension of the *New York Times* test" to every item of public interest "would abridge this legitimate state interest to a degree that we find unacceptable." *Id.*, at 346.[11] Accordingly, in *Gertz* v. *Robert Welch, Inc.*, this

---

[11] See 418 U. S., at 342 ("Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test").

Court rejected the *Rosenbloom* plurality's assumption that the risk of error must invariably be borne by the libel plaintiff, regardless of his or her status, as long as the defamatory statement touches "matters of public or general concern." *Rosenbloom* v. *Metromedia*, 403 U. S., at 44. *Gertz* thus forecloses the Court's unacknowledged reliance on the discredited analysis of the *Rosenbloom* plurality; where private-figure libel plaintiffs are involved, the First Amendment does *not* "requir[e] us to tip [the scales] in favor of protecting true speech" merely because that speech addresses "matters of public concern." *Ante*, at 776. See 418 U. S., at 345–346. See also *Time, Inc.* v. *Firestone*, 424 U. S., at 454–456 (refusing to "reinstate the doctrine advanced in the plurality opinion in *Rosenbloom*" in the guise of protection for inaccurate reporting on "public controversies" or on judicial proceedings).

In my view, as long as publishers are protected by the requirement that the plaintiff has the burden of proving fault, there can be little, if any, basis for a concern that a significant amount of true speech will be deterred unless the private person victimized by a malicious libel can also carry the burden of proving falsity. The Court's decision trades on the good names of private individuals with little First Amendment coin to show for it.

I respectfully dissent.